**NOT FOR PUBLICATION**                                                    **[22/27]**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                          :
NANCIE FISHER, aka                        :
NANCIE CHASKO, on behalf of               :       Civil Action No. 05-2020 (FLW)
T.C.,                                     :
                                          :
        Plaintiff-Appellant,              :
                                          :       **OPINION**
    v.                                    :
                                          :
STAFFORD TOWNSHIP BOARD OF                :
EDUCATION,                                :
                                          :
        Defendant-Appellee.               :
_____:

APPEARANCES:

For Plaintiff-Appellant:
JONATHAN S. CORCHNOY
1515 Market Street, Suite 1510
Philadelphia, PA 19102

For Defendant-Appellee:
TRACEY L. SCHNEIDER
Stafford Township School District
775 East Bay Avenue
Manahawkin, NJ 08050

**WOLFSON, United States District Judge:**

Presently before the Court is Nancie Fisher's ("Fisher" or "Appellant") motion for summary judgment on her appeal, wherein she claims entitlement under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 et seq., to reimbursement for payments made to aides in connection with the public education being provided to her eleven-year-old son (hereinafter referred to as "T.C.") by the Stafford Township Board of Education (the "Board" or "Appellee"). The Board opposes Fisher's motion and has filed a cross-motion for summary judgment on the issue. Administrative Law Judge Israel D. Dubin (the "ALJ" or "ALJ Dubin") found that the Board had offered T.C. a free appropriate public education in accordance with the IDEA and that Fisher failed to comply with the regulations governing reimbursement. As such, he denied Fisher's claim for reimbursement. Fisher now appeals that decision. This Court has jurisdiction pursuant to 20 U.S.C. § 1415. For the reasons set forth below, the Board's Motion for Summary Judgment is granted, Fisher's Motion for Summary Judgment is denied, and the March 14, 2005 decision of the ALJ is affirmed.

I.      **BACKGROUND**

The procedural history of this case is more fully set forth in a previous Opinion of this Court issued on August 30, 2006. In that Opinion, this Court denied Fisher's motion for summary judgment without prejudice and directed the parties to file motion papers in accordance with the burden of proof as outlined by the Supreme Court and the Third Circuit in Schaffer v. Weast, 546 U.S. 49, 126 S. Ct. 528, 537, 163 L.Ed.2d 387 (2005) and L.E. v. Ramsey Bd. of Ed.,

435 F.3d 384, 391-92 (3d Cir. 2006), respectively.[1]   Additionally, based upon the Court's

concern that the Board was unaware that its counsel had failed to file opposition to Appellant's

motion for summary judgment, this Court ordered counsel to serve the Board with a copy of the

August 30, 2006 Opinion and Order and provide proof of service of same to the Court.   Counsel

failed to comply with this Court's Order and likewise failed to file a cross-motion for summary

judgment as directed.[2]   The Board has since retained new counsel and through new counsel

finally responds to Appellant's motion for summary judgment and seeks summary judgment in

its favor.

     The dispute in the instant case centers on T.C., a child who was initially diagnosed with

Pervasive Developmental Disorder in March 1995, and Autism shortly thereafter.  (Ex. D-11, p.3

to Board's Statement of Undisputed Facts ("Board's Stmt."). While enrolled in the West

Paterson School District, T.C. was classified as eligible for special education and related services

under the category of Autistic.  In the summer of 2001, Fisher and T.C moved into the Stafford

Township School District (the "District") and Fisher enrolled T.C. therein.  Hrg. Tr. At 30:1-3

(Aug. 18, 2004).  At that time, T.C.'s most current Individual Education Program ("IEP") was

one drafted by West Paterson Child Study Team ("CST") for the 2001-2002 school year.

(Board's Stmt., p.2).  The West Paterson IEP called for T.C. to receive a personal aide for the full

school day, which aide would be required to complete ABA Training in the Special Education

---

[1]    The Court's directive in this regard was based upon the fact that Appellant, in her initial brief, maintained that the Board bore the burden to prove by a preponderance of the evidence that it complied with the IDEA.  As this Court noted in its August 30, 2006 Opinion, this Court is bound by L.E. v. Ramsey Bd. of Ed., 435 F.3d 384, 391-92 (3d Cir. 2006) and Schaffer v. Weast, 546 U.S. 49, 126 S. Ct. 528, 163 L.Ed.2d 387 (2005), which make clear that the party seeking relief in an administrative hearing challenging an IEP bears the burden of proof.

[2]    Issues related to original counsel's failure to comply with the Court's August 30, 2006 Order were the subject of an Order to Show Cause and Motion for Sanctions decided by this Court on January 10, 2007.

Class.  (Id.).  At Fisher's request, the IEP also called for T.C. to be placed in the summer

Extended School Year ("ESY") program at the Oxycocus School in Stafford Township. (Id.).

The ESY program was to include two consultations totaling six hours by the LOVAAS Training

Institute of UCLA ("LOVAAS" or "LOVAAS Institute").  (Id.).

On October 3, 2001, the Stafford Township CST convened to conduct an annual review

for T.C. and issued a new IEP for the 2001-2002 school year.  (Board's Stmt., at p.2; Ex. D-12).

According to the 2001-2002 IEP, T.C. was to be assigned a one-to-one teaching assistant in all

locations on a daily basis and for the entire length of the school day.  (Ex. D-12)  It also

obligated the Board to arrange for up to twelve hours per month of consultation provided by

LOVAAS Institute personnel for the entire 2001-2002 school year.  (Ex. D-12; P-9).  The same

was true of the revised IEP effective December 14, 2001 through December 13, 2002, and the

proposed IEP effective July 1, 2002 through July 1, 2003.  (Ex. D-13, -14; P-11, -12).  The

revised IEP effective October 21, 2002  through October 20, 2003, added ten hours of in-home

tutoring at the District's expense.  (D-15; P-13).  The IEP effective October 7, 2003 through

October 7, 2004, also included the ten hours of in-home tutoring.  (D-16).

Although all of the IEPs at issue obligated the Board to arrange for training to be

provided by the LOVAAS Institute, it was not until the revised IEP effective October 21, 2002

through October 20, 2003, that the Board expressly incorporated the requirement that the

"personal assistant will be trained by the LOVAAS Institute representative and will be expected

to follow the 17 steps suggested by the LOVAAS Institute."  (D-15, p.5).  Nevertheless, it

appears from the record that the language in the IEPs referring to consultation with the LOVAAS

Institute was understood by the parties to mean that T.C.'s one-to-one teaching assistant was to

4

receive training from the LOVAAS Institute.  Hrg. Tr. at 35:6-20 (Aug. 18, 2004).  Indeed, the

Board does not take issue with Fisher's statement that "[t]he one-on-one aide was to follow the

Lovaas methodology of ABA as instructed by the Lovaas Institute through its consultant to the

District."  (Appellant's Stmt. of Undisputed Facts ¶ 11).

In accordance with the relevant IEPs, the Board arranged for a number of different aides,

commencing in the summer of 2001, to be trained by Ray Cepeda, a LOVAAS Institute

workshop leader and private consultant.  Hrg. Tr. at 31, 35 (Aug. 18, 2004).  The first was Karen

Ruster, who trained with Cepeda and provided services as T.C's aide, until it became apparent

that she could not provide the services T.C. required.  Hrg. Tr. at 36-37 (Aug. 18, 2004); Hrg. Tr.

10-11 (Aug. 20, 2004).  Fisher thereafter removed T.C. from school and kept him home until the

Board could provide a suitable replacement.  Hrg. Tr. at 37:4-8 (Aug. 18, 2004).

In September 2001, Gary Pulz, T.C.'s case manager, called Fisher, who had been looking

for an in-home aide.  Hrg. Tr. at 38:12 - 39:9 (Aug. 18, 2004).  Pulz advised Fisher to call Joseph

Hagan ("Hagan"), who had responded to an advertisement the Board had published for an in-

home aide position.  After Fisher contacted Hagan, he completed substantial LOVAAS training

with Ray Cepeda in Fisher's home and ultimately agreed to work with T.C. as Fisher's employee.

Hrg. Tr. at 12 (Aug. 18, 2004).  Pleased with Hagan, Fisher soon increased his salary from $10

per hour to $12.50 per hour, and then to $20 per hour. Mr. Hagan testified that he "never

discussed money with anyone but [Fisher]" and received his weekly checks directly from her.

Hrg. Tr. at 19:21-23 (Aug. 18, 2004).[3]

---

[3]     While the IEP in place at that time did not call for the District to provide T.C. with an in-home
aide, Fisher has also requested that the District reimburse her for these expenditures.

In December 2001, Fisher encouraged the Board to employ Hagan as T.C.'s one-to-one in-school aide. The Board agreed to do so and offered Mr. Hagan the position at approximately $13,720 per year, the rate set forth in the Collective Bargaining Agreement for a one-to-one aide. Hagan testified that he knew how much work the position required because he been T.C.'s in-home aide for several months and had participated in IEP meetings.  Hagan accepted the one-to-one in-school aide position at the agreed upon salary and continued in that position until the conclusion of the Extended School Year ("ESY") program in August 2002, when he resigned to accept a position at Douglass Developmental Center.  Hrg. Tr. at 16:24 - 20:4 (Aug. 18, 2004).

After Hagan left employment with the Board, the Board arranged for Joanne Butterick and Melissa Rogers to receive LOVAAS training from Ray Cepeda to work as T.C.'s aides. Hrg. Tr. at 56-60 (Aug. 18, 2004).  Butterick, who was to have worked as the in-school aide on Tuesdays and Thursdays, left the assignment after two weeks.  Hrg. Tr. at 57:10 - 58:15 (Aug. 18, 2004).   Rogers began working for Fisher as T.C.'s in-home aide on or about July 22, 2002, and replaced Hagan as T.C.'s Monday, Wednesday, and Friday in-school aide on September 4, 2002, the beginning of the new school year.  However, Rogers informed Fisher that she would not accept the position as T.C.'s in-school aide unless she received more than the salary the District was offering.  Hrg. Tr. at 154:21-155:8 (Aug. 17, 2004).  Rogers believed she should be considered a teacher, not an aide, and be paid accordingly.[4]  Fisher agreed to supplement Rogers' salary paid by the District because she had been pleased with her work to that point.

---

[4]     Among other things, she based this request upon the fact that she was pursuing a Bachelor of Arts degree in special education and had already worked as a substitute teacher.

Rogers testified that she had received $10 per hour from Fisher when she began working as T.C.'s in-home aide in August 2002.  Hrg. Tr. at 168:3 (Aug. 17, 2004).  Once the school year began, she continued to receive this hourly rate from Fisher for her work in that capacity, as well as for her work as T.C.'s in-school aide.  Hrg. Tr. at 168:13-22; 180:2-14 (Aug. 17, 2004).  As such, for each hour she spent with T.C. in school, she received payment from the District and an additional $10 per hour from Fisher.  On October 11, 2002, when T.C.'s new IEP included ten hours of in-home tutoring, Fisher increased the supplemental payment to $12.50 per hour.

According to Rogers, she did not request an increased hourly pay rate from the District when she first applied for and/or accepted the position as in-school aide, nor did she demand pay increases during her tenure in that position.  Hrg. Tr. at 171:4-7 (Aug. 17, 2004).  Rather, she went directly to Fisher and they agreed to this special arrangement because Rogers wanted to be paid as a teacher and not an aide.  Fisher, in turn, agreed to make the supplemental payments until sometime in March 2003.  From that point on Rogers received only the salary the District paid her, which at that point was $17.20 per hour.  Hrg. Tr. at 170-75 (Aug. 17, 2004).

Rogers tenure as T.C.'s in-school aide was brief.[5]  Rogers replaced Hagan as T.C.'s Monday, Wednesday, and Friday in-school aide in September 2002, continuing through until sometime in October.  Since the District did not have another LOVAAS-trained aide available to work with T.C. on Tuesdays and Thursdays, Fisher kept T.C. home on those two days of the week, and on any other days on which Rogers was unavailable.  Hrg. Tr. at 60:2-6 (Aug. 18, 2004).  In October 2002, Fisher hired Julie Mauro to receive LOVAAS training and work with

---

[5]        Although her tenure as T.C.'s in-school aide was brief, ending sometime in October 2002, Rogers continued her employment as T.C.'s home aide until July 28, 2004.  Hrg. Tr. at 141:22 - 142:1 (Aug. 17, 2004).

7

T.C. as his in-home aide.  Hrg. Tr. at 62-69 (Aug. 18, 2004).  Around that time, Fisher made the

unilateral decision to take T.C. out of school five days a week and directed Rogers to report to

Fisher's home[6] on Mondays, Wednesdays and Fridays to assist in training Mauro to become

T.C.'s full-time in-school aide.   Hrg. Tr. at 54:8 - 66:20 (Aug. 17, 2004).

Soon thereafter, Fisher urged Mauro to apply to serve as T.C.'s in-school aide, as well.

After Mauro met with James Sharkey, the District's Director of Special Education Services, she

reportedly told Fisher that the District's advertised annual salary of $14,120 was "unacceptable."

Hrg. Tr. at 67 (Aug. 18, 2004).  As a result, Fisher testified that she wrote a letter to

Superintendent Ronald L. Meinders expressing her frustration with the District and formally

requesting that Ms. Mauro be offered a higher starting salary. Hrg. Tr. at 68 (Aug. 18, 2004).

According to Fisher, the request was denied.

Tired of keeping T.C. out of school, Fisher asked Mauro if she would accept the position

with the understanding that Fisher would pay her $20 per hour; Mauro accepted Fisher's

proposal.  Hrg. Tr. at 63-69, 75 (Aug. 18, 2004).  Fisher, on average, paid Mauro a $300 weekly

salary for her work as T.C.'s in-school and in-home aide. This arrangement continued into the

2003-2004 school year, when Mauro's salary as a District employee increased to $15,000 per

year.  Mauro took over as T.C.'s full-time one-on-one in-school aide at some point in late

October 2002 until her resignation on March 26, 2004. Hrg. Tr. at 74:14-24 (Aug. 18,

2004);(Appellant's Statement of Undisputed Facts, ¶ 55).  According to Fisher, she continued to

supplement Mauro's salary because "Julie was a natural" and "[T.C.] blossomed."  Hrg. Tr. at

---

[6]       Fisher testified that she, rather than the Board, paid Rogers for any hours spent working in Fisher's home during this time period.

76:14 - 77:4 (Aug. 18, 2004).  When Fisher signed T.C.'s 2003-2004 IEP, she included the

following comments:

> I agree to implement the IEP for my son 03-04. I am not in
> agreement with two issues.
> 1. I disagree with the grade level of my child. He is 4-5th grade.
> 2. I disagree with the fact that I am paying $1200.00 a month for
> his therapist to attend school with him.
> [D16; P3]

In March 2004, Mauro resigned her position.  Hrg. Tr. at 74-75 (Aug. 18, 2004).  Fisher

testified that the Board had "threatened" to take unspecified action against Ms. Mauro for

accepting supplemental payments from Fisher.  Hrg. Tr. at 79 (Aug. 18, 2004).  The Board then

employed Jennifer Aljoe, a certified teacher with a Bachelor of Arts degree, to receive LOVAAS

training and serve as T.C.'s aide through the end of the school year at a salary of $17.27 per hour.

Fisher filed her request for a Due Process hearing with the Department of Education,

Office of Special Education Programs, on February 9, 2004.  In a February 9, 2004 letter to the

Office of Special Education Programs requesting the hearing, Fisher's attorney summarized her

complaint as follows:

> The substance of N.F.'s Complaint with the school district is the
> denial of FAPE as noted in IDEA, 20 U.S.C. §1400 et. seq., and
> §504 of the Rehabilitation Act of 1973, due to the failure by your
> district to give [T.C.] a free and appropriate education. Currently
> and for the last several years Ms. [F.] has expended and continues
> to expend one thousand two hundred ($1200.00) dollars per month
> for the agreed in school and home autistic therapist for her son,
> [T.].
>
> In addition, there are various provisions of T.C.'s current IEP
> which call for the District to provide services to him, but have been
> provided less than appropriate for T.C. as called for in his IEP. [T.]
> needs a program which continues year round and for any lengthy
> break from the normal school week. Specifically, he needs the
> services as prescribed in his IEP to continue throughout the

> summer months, winter break, and spring break when regular
> education school programs are not in session.
>
> In addition, recently T.C.'s therapist was not available for a lengthy
> period of time and T.C. went without services. N.F. wants Comp.
> Ed. for this period to be used to train an additional therapist who
> may be available as a substitute teacher whenever his primary
> therapist is unavailable. Such a therapist should have a Bachelor of
> Arts or better as a minimum qualification.
>
> Furthermore, said program should continue into any middle school
> T.C. may be assigned when, and if, that becomes relevant. At
> present, Ms. [F.] disagrees that [T.] is ready for such a setting.
>
> Letter from Jonathan Corchnoy to Office of Special Educ. Programs (Feb. 9,
>
> 2004).

Noting that it had already addressed Fisher's concerns by letter dated January 16, 2004,

the Board responded as follows:

> The Stafford Township Board of Education is providing all
> ABA and after school services that are required to be provided
> pursuant to [T.'s] IEP executed on October 16, 2003.
> Accordingly, the Stafford Township School District is
> underwriting all relevant costs for services delineated in [T.'s]
> IEP. You have failed to either document or account for the
> alleged $1,200.00 per month expenditure. Further, our attorney
> has advised us that if this alleged expenditure is being diverted
> to a Stafford Township School District employee, as you have
> previously indicated, the employee in question would have
> violated District policy at minimum.
>
> I can not address this concern (providing a program "less than
> appropriate for T.C. as called for in his IEP.") because Mr.
> Corchnoy has failed to identify the alleged deficiencies.
>
> For reasons beyond the control of the Stafford Township
> School District, [T.'s] personal aide did not report for work
> during the week of January 5 - 9, 2004. While this situation is
> unfortunate, it does not constitute a "change in placement" or
> "denial of F.A.P.E." Your unilateral decision to keep [T.] out

10

of school last week unnecessarily caused [T.] to miss out on
other educational opportunities afforded to him by the Stafford
Township School District. The District is in the process of
recruiting and training additional aides in the ABA process.
Neither Stafford Township School District Policy, the law, or
the Lovaas theory require that a school aide providing ABA
services posses a Bachelor of Arts Degree.

The Stafford Township School District will do everything
necessary to ensure that [T.'s] transition into the Southern
Regional School District, at the conclusion of this school year,
is successful.

[ALJ Op. at 3-4].

Further, the Board stated that it had given Fisher an opportunity to present her concerns at

the Progress Review Meeting held on February 9, 2004, and had also taken extra measures to

resolve any "potential or perceived problems". Id. at 4.   The Board noted that Fisher "steadfastly

refused to address [the Board's] formal reply to her request and ... failed to provide any

documentary evidence for her alleged $1,200.00 per month expenditure." Id.   Thus, the Board

maintained that it was still unaware of the nature or extent of the services Fisher had procured

independently; whether those services were of the type the Board had agreed to provide; and, as

to the services that were being provided, those that were "less than appropriate" and the remedy

that Fisher sought.   Id.

On March 8, 2004, the Commissioner of Education transmitted the matter to the Office of

Administrative Law with a request that an Administrative Law Judge be assigned to conduct a

hearing.   The Director of the OAL thereafter assigned the case to ALJ Dubin.   The hearing was

ultimately held over the course of several days in August 2004.   At the hearing, Ray Cepeda

testified that he attended T.C.'s IEP meetings and recalled that at those meetings, Fisher stated

that the aides "weren't being paid enough and that she was providing them with additional

income to continue working with T."  Hrg. Tr. at 21:12-22 (Aug. 20, 2004).  Cepeda testified that

to the best of his recollection Fisher brought up having to pay T.C.'s aides at every IEP meeting

at which he was present.  Id. at 22:10-15.  Cepeda did not recall how the District responded at

any such IEP meeting, but averred that Fisher made it "very clear" that she sought reimbursement

from the District and/or for the District to pay the aides more money.  Id. at 22:16-24.  Melissa

Rogers testified that James Sharkey, the District's Director of Special Education Services, and

Gary Pultz, who worked for Sharkey, were aware that Fisher was compensating her.  Hrg. Tr. at

146:24-147:19 (Aug. 17, 2004).  However, she also averred that she never informed the District

directly about the payments.  Id.  Fisher testified that at the IEP meetings, she spoke of the

payments she made to T.C.'s aides and that Sharkey and Pultz attended the meetings and, as

such, were aware of the payments.  Hrg. Tr. at 75:21-76:10 (Aug. 18, 2004).  She also testified

that she met with Ronald Meinders, the superintendent of schools, and notified him of the

payments, as well.  Id. at 76:4-8.

Deborah Addesso, the District's director of special services, testified that although T.C.

had worked with several different aides and had not attended school on those days that the aides

were unavailable, he appeared to have done, and continued to do, very well, seemed to be

comfortable in his current placement, traveled to and from school on a regular school bus and

appeared to be fine. ALJ Op. at 9.  To the best of Addesso's knowledge, T.C. was on track to

graduate sixth grade and move on to middle school.  Id.

Following the hearing, petitioner's and respondent's initial briefs were to be submitted by

October 8 and November 5, 2004, respectively, pursuant to a briefing schedule. Although

petitioner's brief was submitted in a timely manner, respondent's was not, even after several

extensions had been granted. The record was closed on December 29, 2004, when the Board's

post-hearing brief was due to have been filed.  ALJ Op. at 2.

By way of a decision dated March 14, 2005, the ALJ dismissed Fisher's petition.

In doing so, he noted that Fisher had "not actually taken issue with the IEPs themselves, or

otherwise alleged that the placements, curricula, or supplementary aids and services were not

reasonably calculated to enable her son, T.C., to advance. Nor has she claimed that they actually

failed to provide T.C. with an opportunity for 'significant learning' or 'meaningful educational

benefit.'" ALJ Op. at 14-15.

He also found that the District had no reason to believe that it was not underwriting all

relevant costs for services delineated in T.C.'s IEP.  He noted that the District entered into

contracts with, and paid the salaries it was contractually obligated to pay, the aides and in turn,

the aides carried out their work for the salaries they agreed to receive. None declined

employment, expressed an intention to resign, or did in fact resign for want of what they believed

to be appropriate compensation. In fact, other than Fisher's objection to "paying $1200.00 a

month for [T.C.'s] therapist to attend school with him," the District had absolutely no reason to

believe that it was not in compliance or could not comply with the IEP.  Id. at 15.  Furthermore,

the ALJ found that even if the aides had been insisting that she subsidize their salaries, Fisher did

nothing to disabuse the District of its belief that nothing was wrong, nor did she notify it of her

intentions to subsidize the aides and hold the District financially responsible prior to taking such

unilateral action. Id. at 15.  Although Fisher testified that she had on several occasions voiced her

frustrations over having to pay the $1200 per month, the ALJ noted that she did not provide the

District with written notice of the action she had already taken until December 13, 2003, when she signed the 2003-04 IEP.  Id. at 15-16.

In the typical reimbursement case, parents who have withdrawn their child from public school and unilaterally placed him or her in private school while challenging the IEP, seek reimbursement for the private school tuition.  Pursuant to N.J.A.C. 6A:14-2.10(c)(2), parents seeking reimbursement must provide notice to the district board of education of their concerns and their intent to enroll their child in a nonpublic school at public expense. The cost of reimbursement may be reduced or denied if at least ten business days (including any holidays that occur on a business day) prior to the removal of the student from the public school, the parents did not give written notice to the district board of education of their concerns or intent to enroll their child in a nonpublic school.  N.J.A.C. 6A:14-2.10(c)(2).  Here, the ALJ found that because Fisher never issued a written request for reimbursement, she failed to comply with the spirit, if not the letter, of N.J.A.C. 6A:14-2.10(c) and should not be entitled to reimbursement.  Id. at 16.

Additionally, the ALJ found that Fisher did not provide the District with documentation or otherwise account for the $1200 per month expenditures when it asked her to do so.  Id.  The documentation was not provided until some time after the request for due process had been filed.  According to N.J.A.C. 6A:14-2.10(c)(3), the cost of reimbursement may be reduced or denied if prior to the parents' removal of the student from the public school, the District proposed a reevaluation of the student and provided notice according to N.J.A.C. 6A:14-2.3 but the parents did not make the student available for such evaluation.  Here, the ALJ determined that the District's request was the virtual equivalent of a request to conduct reevaluations of a student prior to a unilateral placement.  Id.  Moreover, he concluded that the failure to provide the

14

District with documentation, such as time sheets reflecting the dates and total number of hours each aide worked as an in-school or in-home assistant, in a timely fashion, deprived the District of an opportunity to review and, if necessary, address Fisher's concerns as they arose with respect to each individual aide. Id.  The ALJ stated that this too may be seen as a failure to comply with the spirit, if not the letter, of N.J.A.C. 6A:14-2.10(c) and constitute sufficient grounds for a denial of reimbursement.  Id.

The ALJ noted that while the District was unable to provide T.C. with a LOVAAS-trained in-school aide on Tuesdays and Thursdays in September and October 2002, and on other days when his aide did not report for work or was otherwise unavailable, it did have a pool of eight other one-to-one aides and would have provided one to work with T.C.  Id.   The ALJ further noted that such an aide working under the direct supervision of the classroom teacher, while not LOVAAS-trained, would have enabled T.C. to participate in classroom activities and, at the very least, accompanied him on class trips into the community to generalize and apply the life skills he had learned.  Id.

In School Committee of Burlington v. Massachusetts Department of Education, 471 U.S. 370, 370-71, 105 S.Ct. 1996, 85 L.Ed. 385 (1985), the Supreme Court explained IDEA reimbursement: "Reimbursement merely requires [a district board of education] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP."  Here, the ALJ distinguished this case from School Committee of Burlington, noting that there is nothing to suggest that the IEPs themselves were inappropriate or that the district did not pay for and provide the relevant services delineated in them.  Id. at 17. He also found that there is no evidence to suggest, much less establish, that the District's

15

inability to provide a LOVAAS-trained substitute aide on an unspecified number of days rendered the IEPs inappropriate or otherwise constituted a denial of a FAPE.  The ALJ noted the fact that Fisher did not demand compensatory education in the form of additional hours of in-school or in-home instruction to make up for the lost days but, rather, requested that "Comp. Ed. for this period … be used to train an additional therapist who may be available as a substitute teacher whenever his primary therapist is unavailable. Such a therapist should have a Bachelor of Arts or better as a minimum qualification." Id. at 17.  The ALJ found that, from this, one may infer that the demand for compensatory education could not be tied to and was not intended to redress any actual harm T.C. may have suffered.  Instead, it was designed to prevent the possibility that it might be experienced in the future, which he deemed a "laudable goal," but one that is not consistent with "the raison d'être for compensatory education." Id.

## II.    LEGAL FRAMEWORK

### A.  Standard of Review

"Where no new evidence has been presented to the Court, motions for summary judgment in an IDEA case are the procedural vehicle for asking the judge to decide the case based on the administrative record."  K.H. o/b/o B.Y. v. North Hunterdon-Vorhees Regional, No. 05-4925, 2006 WL 2331106, * 4  (D.N.J. Aug. 10, 2006)(citing M.A. v. Vorhees Twp. Bd. of Educ., 202 F.Supp.2d 345, 359 (D.N.J. 2002)).  The standard of review in an IDEA case "differs from that governing the typical review of summary judgment."  M.A. v. Vorhees Twp. Bd. of Educ., 202 F.Supp.2d 345, 359 D.N.J. (2002)(quoting Heather S. by Kathy S. v. State of Wisconsin,   125 F.3d 1045, 1052 (7th Cir. 1997), aff'd by M.A. v. Vorhees Twp. Bd. of Educ., 65 Fed.Appx. 404

(3d Cir. 2003) .  In an IDEA case, this Court is required to give the factual findings of the administrative law judge a "modified version of de novo review." L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 (3d Cir. 2006).  Under this standard, the Court gives "due weight" to the determinations of the administrative law judge.  Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley, 458 U.S. 176, 206 (1982).

The purpose of the "due weight" standard is to prevent the courts from imposing their own "view of preferable educational methods on the states." Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982).  However, the Court is not required to accept the findings of the administrative law judge, Carlisle Area School v. Scott P. By and Through Bess P., 62 F.3d 520, 529 (3d Cir.1995), as long as the Court "fully explain[s] its reasons for departing from the state decision," S.H. v. State-Operated School Dist. of City of Newark, 336 F.3d 260, 271 (3d Cir. 2003).

### B.  Individuals With Disabilities Education Act, 20 U.S.C. 1400 et seq.

Congress enacted the IDEA as a means to ensure that states follow a mandate to provide a "free and appropriate education" ("FAPE") to all disabled children.  20 U.S.C. § 1412(a)(1)(A).  "Educational instruction specially designed to meet the unique needs of the handicapped child," coupled with services "necessary to permit the child to 'benefit' from the instruction" constitute a FAPE.  Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 756 (3d Cir.1995) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 188-89 (1982)).  The IDEA instructs states to develop a detailed instructional plan, known as an IEP, for every disabled child.  20 U.S.C. § 1412(a)(4).  The IEP must address and include several elements as provided under 20 U.S.C. § 1414(d)(1)(A), and is designed to ensure implementation of a FAPE for the child. S.H. v. State-Operated Sch. Dist. of

Newark, 336 F.3d 260, 264 (3d Cir. 2003).  The IEP is developed by a team consisting of the

child's parent(s), at least one of the child's special education teachers, a curriculum specialist and,

if the parent or school board requests, a person with special knowledge or expertise related to the

child's education.  Id.;  see also 20 U.S.C. § 1414(d)(1)(B).  The team must review the IEP

annually "to determine whether the annual goals for the child are being achieved." 20 U.S.C. §

1414(d)(4).  New Jersey has enacted regulations which are intended to fulfill its responsibilities

under the IDEA.  N.J.A.C. 6A:14-1.1(b).

A parent who believes that a school district has not provided his or her child with a FAPE

as required under IDEA, may request a due process hearing or a mediation conference.  See

Lascari v. Bd. of Educ., 116 N.J. 30, 37, 560 A.2d 1180, 1184 (1989).  New Jersey has

designated its Office of Administrative Law ("OAL") to hear the special education complaints

filed with the Department. L.P. v. Edison Bd. of Educ., 265 N.J. Super. 266, 274 (Law

Div.1993).  The dispute is adjudicated by an ALJ, who has authority under the IDEA and New

Jersey law to deem the IEP inappropriate. See id.; N.J.A.C. 6A:14-2.7.  Parents challenging the

IEP may be entitled to reimbursement of their education costs if the ALJ finds that the IEP was

inappropriate, and that the parents' unilateral placement was appropriate, Florence Cty. Schl.

Dist. v. Carter, 510 U.S. 7, 12, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993), if the parents complied

with the notice and reevaluation requirements of the IDEA and New Jersey regulations, 20

U.S.C. § 1412(a)(10) and N.J.A.C. 6A:14-2.10(c), and if the parents cooperated with the school

district, Patricia P. v. Board of Educ. of Oak Park, 203 F.3d 462, 468 (7th Cir. 2000).   Pursuant

to 20 U.S.C. § 1415(i)(2), aggrieved parties may appeal the ALJ's decision to a state or federal

district court.

## III.    DISCUSSION

On appeal, Fisher seeks a determination from this Court that T.C. was not provided with a FAPE and that she is entitled to reimbursement for payments made to T.C.'s aides.  Fisher contends that the Board failed to provide a FAPE as required by the IDEA because T.C.'s education was not "free".  Fisher's contention in this regard rests on her claim that the District failed to provide a "free" aide that met the qualifications required by T.C.'s IEPs until after she filed her request for a due process hearing.

The ALJ analyzed the case as though it were a unilateral placement case.[7]  In a unilateral placement case, however, the ALJ must first determine whether the district's IEP was appropriate.  See Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 158 (3d Cir. 1994)(holding in unilateral placement case that "the right of review contains a corresponding parental duty to unequivocally place in issue the appropriateness of an IEP.").  In this case, Fisher concedes that she is not challenging the appropriateness of the IEPs in place during the relevant time period.  Indeed, Fisher agrees that "[t]he record is clear that the parties agreed that the services promised in the IEPs were appropriate."  (Appellant's Brief in Support of Summary Judgment at p. 27-28).  Rather, Fisher's argument to the ALJ and on appeal is that she is entitled to reimbursement because had she not made supplemental payments to T.C.'s aides, the aides would not have

_____

[7]         In the typical unilateral placement case, parents who have withdrawn their child from public school and unilaterally placed him or her in private school while challenging the IEP, seek reimbursement for the private school tuition.

worked for the District. Accordingly, this Court finds the instant case more akin to those cases in which it is alleged that a district has failed to fully implement an IEP.[8]

That a child's education be provided in conformity with his or her IEP is a component of a FAPE. 20 U.S.C. § 1401(9); 34 C.F.R. § 300.17(d). Indeed, under both State and federal law, a district has an obligation to implement the IEP. 20 U.S.C. § 1412(a)(4). "To prevail on a claim that a school district failed to implement an IEP, a plaintiff must show that the school failed to implement substantial or significant provisions of the IEP, as opposed to a mere *de minimis* failure, such that the disabled child was denied a meaningful educational benefit." Melissa S. v. School District of Pittsburgh, 183 Fed. Appx. 184, 187 (3d Cir. 2006)(citing Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 349 (5th Cir. 2000)); see also Leighty v. Laurel School Dist., 457 F.Supp.2d 546, 554 (W.D.Pa. 2006).

Had Fisher never supplemented the aides' pay, the picture would be much clearer because the District would have either implemented the IEPs by hiring LOVAAS trained aides, which would suggest that it was indeed offering sufficient compensation, or the District would have been unable to hire properly trained aides, which would evidence its failure to implement the IEPs. Had this latter scenario played out, Fisher's argument would be more convincing. By stepping in and paying the aides supplemental compensation – beyond their contractually agreed-

---

[8]    Notwithstanding this Court's conclusion that the true nature of Fisher's claims concerns the question of whether the agreed upon IEPs were properly implemented, I agree with the ALJ's finding that Fisher's claims, evaluated under the standards of a unilateral placement case, would nevertheless fail. Indeed, even if the Court were to accept Fisher's contention that properly trained aides would have been unavailable in the absence of her supplemental payments, a contention wholly unsupported by the record, it is undisputed that she never provided the Board with written notice of her request for reimbursement as required by N.J.A.C. 6A:14-2.10(c)(2). Instead, Fisher argues that "there is no requirement that the parents inform the District in writing if they notify the District at the IEP meeting." (See Appellant's Brief at p. 21). However, Fisher provides no support for this proposition. Thus, I concur with the ALJ's determination that Fisher is barred under the IDEA, applicable regulations and relevant case law from seeking reimbursement from the Board.

to salaries with the Board – Fisher in effect never allowed the situation to reach the point of non-implementation.  While Fisher's conduct was seemingly in her son's best interests, she asks this Court to find that her son would not have had the aides without her supplemental payments.  Such a finding would be purely speculative.

In the instant appeal, based on her recognition of a two-year statute of limitations period on her claims, Fisher seeks reimbursement of educational expenses for one-on-one aide services beginning on February 13, 2002.[9]  (See Compl. at ¶ 66).  After conducting a thorough review of the record and applying the modified de novo standard to the ALJ's decision, this Court does not find that Fisher is entitled to reimbursement for supplemental payments made by her to T.C.'s aides.  The burden here was on Fisher to prove by a preponderance of the evidence that the Board's conduct violated the requirements of the IDEA.[10]  There is simply no evidence in the record that the Board failed to implement the applicable IEPs.   Although Fisher alleges that LOVAAS trained aides would have been unavailable had she not provided supplemental payments, there is no support in the record for that contention other than her self-serving

---

[9]      It appears from the record that the parties addressed the applicable limitations period with the ALJ, and neither Fisher, nor the Board, challenges the application of a two-year limitations period on appeal to this Court.  Thus, for the purposes of this appeal, this Court accepts Fisher's assertion that the appropriate statute of limitations with respect to her claims is two years.  (See Appellant's Stmt. of Undisputed Facts, Conclusions of Law ¶¶ 8, 12 and 14).

[10]      The Court notes that counsel for Fisher has throughout the administrative proceedings and the appeal before this Court presented the case as a unilateral placement case, which necessarily implicates the appropriateness of the IEP, thereby placing the burden on Fisher as the party seeking relief.  See Schaffer v. Weast, 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005)("burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief"); L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 391-92 (3d Cir. 2006).  Despite the fact that this Court has analyzed this case as a challenge to the Board's alleged failure to implement the IEP, rather than a unilateral placement case, in light of Fisher's concession that she is not challenging the appropriateness of the relevant IEPs, the Court nevertheless finds that in the absence of a New Jersey statute or regulation placing the burden on the school district, there is simply no reason to depart from the default rule recognized by the Supreme Court in Schaffer that "plaintiffs bear the risk of failing to prove their claims."  Schaffer, 546 U.S. at 534.

testimony.  Indeed, the ALJ noted that other than Fisher's written objection in T.C.'s 2003-04

IEP to "paying $1200.00 a month for his therapist to attend school with him", the District had no

reason to believe that it was not in compliance or could not comply with T.C.'s IEPs.  ALJ Op. at

p. 15.  The ALJ was careful to point out that not one of the aides employed by the District during

the relevant time period "declined employment, expressed an intention to resign, or did in fact

resign for want of what they believed to be appropriate compensation."  ALJ Op. at p. 15.

However, even if the Court were to accept Fisher's contention that the individual aides to

whom she provided supplemental income would not have continued employment with the

District in the absence of her supplemental payments, she presents absolutely no evidence that

the Board would have been unable to secure replacement aides who were appropriately trained.

Significantly, as the ALJ pointed out in his opinion, Jennifer Aljoe, who was hired upon Mauro's

resignation, was the most qualified of any of the aides and "finished the year as T.C.'s aide for

the then-advertised salary of $17.27 per hour; an amount less than even the $20 per hour subsidy

that Dr. F. believed she had to pay to ensure T.C.'s continued instruction."  ALJ Op. at 15, n. 14.

In short, Fisher is unable to show, as it is her burden to do, that but for her payments, the District

would not have employed appropriately trained aides for T.C.

This Court agrees with the ALJ's determination that the brief period of time in September

and October 2002 during which a LOVAAS trained aide was unavailable on Tuesdays and

Thursdays does not constitute the denial of a FAPE.  See ALJ Op. at pg. 16.  Although the exact

length of time that T.C. was without a LOVAAS trained aide on Tuesdays and Thursdays is not entirely clear from the testimony presented in the record,[11] it appears that it began sometime after the second week in September and continued until sometime "later in October". Hrg. Tr. at 68:16-23.[12] This Court finds that the unavailability of a LOVAAS trained aide on Tuesdays and Thursdays for a period of no more than five weeks does not rise to the level of failure on the part of the Board to comply with the applicable IEP.[13] As the ALJ noted, a pool of eight other non-LOVAAS trained one-to-one aides was available during that time who, under the direct supervision of T.C.'s classroom teacher, would have enabled T.C. to participate in classroom activities and accompanied him on class trips into the community. Furthermore, Fisher unilaterally removed T.C. from the school setting for approximately four of those weeks and chose not to have him participate with his LOVAAS trained aide on the three days a week that she was available in the classroom. During these weeks, Fisher determined that the aide should work with T.C. in the home setting and train a new aide there. There is simply nothing in the record to substantiate Fisher's position that such a decision to remove T.C., totally from the school setting, was warranted. Instead, Fisher's educational decision, even if well-intentioned, is

---

[11]     This Court is compelled to comment on the care and attention accorded the matter by the ALJ below. Indeed, at numerous times during the testimony when counsel for either party failed to elicit a correct time frame for the period in question or failed to clearly elicit testimony from a witness, the ALJ was careful to summarize the testimony and confer with the witness so that the record was as clear as possible.

[12]     Parenthetically, the Court notes that Fisher made the unilateral decision in October, when she hired Julie Mauro, to keep T.C. out of school five days a week and directed Rogers to report to her home on Mondays, Wednesdays and Fridays to assist in training Mauro. Hrg. Tr. at 54:8 - 66:20 (Aug. 17, 2004).

[13]     Although Fisher testified that it was she, rather than the Board, who placed the advertisement for the new aide in the newspaper, there is nothing in the record to suggest complacency or inaction on the part of the Board. Rather, a careful review of the record reveals a consistent pattern in Fisher's relationship with the District of Fisher exercising control over the selection and performance of T.C.'s LOVAAS trained aides. In so noting, the Court passes no judgment on Fisher's conduct, but finds simply that there is no evidence in the record of inaction by the Board.

but one example, in a long line of examples, of Fisher acting without consultation with the CST. No opportunity was given to the District to provide T.C. with an educational benefit in the school setting during these times.

Similarly, this Court agrees with the ALJ's conclusion that the failure to provide a LOVAAS trained aide on other unspecified days when T.C.'s aide was unavailable or did not report to work does not constitute a denial of FAPE. Rather, these sporadic unexplained absences were, at most, *de minimis* failures to fully implement TC's IEP.[14] Fisher has simply failed to satisfy her burden to demonstrate that T.C. was deprived of meaningful educational benefit as a result of the District's conduct, or that T.C. failed to receive a FAPE.

Finally, this Court rejects Fisher's arguments that the No Child Left Behind Act (the "NCLB Act") "effectively overrules the 'meaningful educational benefit' standard enunciated by the 3rd Circuit in Ridgewood Bd. of Ed. v. N.E., 172 F.3d 238 (3d Cir. 1999) and reaffirmed in T.R. v. Kingwood Tp. Bd. of Ed., 205 F.3d 572, 577 (3d Cir. 2000) for the higher standard of 'ensur[ing] that all children have a fair, equal, and significant opportunity to obtain a high-quality education.'" The sole basis proffered by Fisher for this contention is the requirement in the NCLB Act, 20 U.S.C. § 6311(a)(1), that the state plan be coordinated with the IDEA. Fisher contends that NCLB Act's reference to coordination with the IDEA necessarily requires the

---

[14]        On this point, the ALJ found significant the fact that Fisher did not demand compensatory education in the form of additional hours of in-school or at-home instruction to make up for lost days, but rather requested compensatory education for that period "be used to train an additional therapist who may be available as a substitute teacher whenever his primary therapist is unavailable." ALJ Op. at 17. The ALJ concluded that compensatory education was not appropriate because Fisher's request was not intended to redress actual harm, but, rather, to prevent the possibility that such harm might be experienced in the future. This Court notes that during the course of these proceedings, while in conference with the Court, counsel represented that T.C. was no longer attending school within the District's jurisdiction, thus the compensatory education and injunctive relief were no longer being pursued. This is strictly a case concerning Fisher's right to reimbursement.

incorporation in an IDEA case of the "high-quality education" standard referred to in the NCLB Act.[15]

There is absolutely no support in the statutes or case law for Fisher's attempt engraft the achievement standards referenced in the NCLB Act onto the IDEA.  Indeed, such an argument was recently rejected by another district court within this circuit.  In Leighty v. Laurel School District, 457 F.Supp.2d 546, 561 (W.D.Pa. 2006), the court examined whether the requirement under the NCLB Act, 20 U.S.C.A. § 6311(a)(1), that the plan submitted by state educational agencies be coordinated with the IDEA alters the IDEA's FAPE and IEP requirements.  The Leighty court concluded that the NCLB Act did not alter its analysis with regard to whether the FAPE and IEP requirements had been met under the IDEA.  Citing Arlington Central School District Board of Education v. Murphy, -- U.S. --, 126 S.Ct. 2455, 265 L.Ed.2d 526 (2006), the Leighty court reasoned that because the IDEA was enacted pursuant to Congress' authority under the Spending Clause, the statutory language regarding coordination must constitute an unambiguous change in the conditions imposed on recipient states by the IDEA before the court would view the coordination language as altering the IDEA's FAPE and IEP requirements.  The Leighty court concluded that because it did not view the language in 20 U.S.C.A. § 6311(a)(1) concerning the coordination of state plans as an unambiguous change in the conditions imposed

---

[15]     Although Fisher presents this argument in the context of a unilateral placement case, this Court nevertheless addresses the argument given the standard employed by the Third Circuit in evaluating failure to implement cases, which, as previously noted, requires a showing that a school failed to implement substantial or significant provisions of the IEP such that the child was denied a meaningful educational benefit.  See Melissa S. By Karen S. v. School District of Pittsburgh, 183 Fed. Appx. 184 (3d Cir. 2006)("To prevail on a claim that a school district failed to implement an IEP, a plaintiff must show that the school failed to implement substantial or significant provisions of the IEP, as opposed to a mere de minimis failure, such that the disabled child was denied a meaningful educational benefit.")

on recipient states by the IDEA, it could not find that 20 U.S.C.A. § 6311(a)(1) altered the IDEA's FAPE and IEP requirements.

This Court agrees with the Leighty court's analysis.  Further, the Court notes that despite Fisher's suggestion that the decisions applying the "meaningful educational benefit standard" were made "before NCLB became law", Fisher is unable to point to any case in this circuit which, since the enactment of the NCLB Act in 2002, has applied anything other than the meaningful educational benefit standard recognized by the Third Circuit Ridgewood Bd. of Ed. v. N.E., 172 F.3d 238 (3d Cir. 1999).  Indeed, the Court finds numerous IDEA cases decided after the 2002 enactment of the NCLB Act which have accepted the meaningful educational benefit standard as the appropriate standard to be applied in determining whether an IEP is appropriate under the IDEA, as well as whether an IEP has been properly implemented.  See e.g., A.H. ex rel. M.H. v. New Jersey Dept. of Educ., No. 05-cv-3307, 2006 WL 3359644 (D.N.J. Nov. 20, 2006); E.G. ex rel. S.G. v. Lakewood Regional High School Bd. of Educ., No. 05-cv-3607, 2007 WL 174172 (D.N.J. Jan. 22, 2007); J.A. v. Mountain Lakes Bd. of Educ., No. 05-cv-5953, 2006 WL 2583445 (D.N.J. Sept. 6, 2006); L.E. v. Ramsey Bd. of Educ., 435 F.3d 384 (3d Cir. 2006); Marissa F. ex rel. Mark and Lavina F. v. William Penn School Dist., 199 Fed. Appx. 151 (3d Cir. 2006); and P.D. v. Franklin Twp. Bd. of Educ., No. 05-cv-2363, 2006 WL 753152 (D.N.J. Mar. 23, 2006).  See also, Melissa S. v. School District of Pittsburgh, 183 Fed. Appx. 184 (3d Cir. 2006)(accepting meaningful educational benefit standard as appropriate standard to be applied in evaluating case alleging failure to implement IEP).

**IV.    CONCLUSION**

For the reasons set forth above, the Board's Motion for Summary Judgment is granted,

Fisher's Motion for Summary Judgment is denied, and the March 14, 2005 decision of the ALJ is

affirmed.   The case is now closed.

_____/s/ Freda L. Wolfson_____
Honorable Freda L. Wolfson
United States District Judge

Dated: February 27, 2007